**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| Res-Care, Inc. | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No.  3:22-CV-150-CHB |
| v. | ) | |
| | ) | |
| Timothy Foster and DB Grant | ) | |
| Associates, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff files this Complaint against Timothy Foster ("Foster") and DB Grant Associates,

Inc. ("Grant Associates") ("Defendants", collectively) for injunctive and monetary relief, and

makes the following allegations in support of its claims:

## THE PARTIES

1.      Plaintiff Res-care, Inc. ("ResCare" or the "Company") is a Corporation

incorporated under the laws of the Commonwealth of Kentucky. Its principal place of business is

located at 805 N. Whittington Parkway, Louisville, Kentucky, 40222.

2.      ResCare is a national leader in the health and human services industry. Through its

affiliates and subsidiaries, the Company operates multiple lines of business, including behavioral

health, community living, family and youth support, home care, home health and hospice care,

neuro rehabilitation, pharmaceutical, telecare and remote support, and workforce development

services.

3.      ResCare is the nation's largest and most comprehensive provider of workforce

services. These services generally include managing career centers and job corps centers for youth,

helping business meet their human capital needs, providing support for low-income families by

connecting them with community resources, and providing the necessary tools to achieve self-

- 1 -

sustaining employment. The Company's workforce solutions brand operated as ResCare Workforce Services up until mid-2020, when it became known as Equus Workforce Solutions.

4.      Grant Associates is also in the workforce development industry and is one of ResCare's direct competitors. According to its website, Grant Associates is one of the largest workforce development organizations in North America. (*See* About - Grant Associates (grantassociatesinc.com)). Grant Associates is a New York corporation, with its principal place of business located at 39 Broadway, 31st Floor, New York, New York 10006.

5.      Timothy Foster is a former executive-level employee of ResCare. Foster's LinkedIn profile describes himself as a "demonstrated professional with over 38 years of success in all aspects of solution sales, including financial services, human services, and systems integration programs."

6.      In January of 2022, Foster resigned his employment to accept a position at Grant Associates as its Vice President of Public and Private Partnerships. Foster officially began working for Grant Associates on or around February 14, 2022. Based upon information and belief, Foster is currently a resident of Arizona.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, because ResCare asserts claims against Foster and Grant Associates for violations of federal law, specifically the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et *seq.*

8.      This Court has supplemental jurisdiction over ResCare's state-law claims under 28 U.S.C. § 1367(a), because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.      This Court has personal jurisdiction over Foster because he consented to the

exclusive jurisdiction and venue of the courts in the Commonwealth of Kentucky with regard to disputes arising out of or relating to his Employment Agreement with ResCare. A true and correct copy of Foster's Employment Agreement is attached as Exhibit A to the Declaration of Bradley Williams ("Williams Decl."), filed contemporaneously herewith.

10.     This Court has personal jurisdiction over Grant Associates because the tortious conduct alleged herein occurred in this judicial district.

11.     Venue is proper in this judicial district because the Employment Agreement is governed by Kentucky law, and Foster agreed that the federal or state courts located in Kentucky shall have exclusive jurisdiction with regard to any litigation relating to the Employment Agreement. *See* Williams Decl., Exhibit A, ¶ 14.

12.     Notwithstanding the forum selection clause in the Employment Agreement, Foster has minimum contacts with the Commonwealth sufficient to confer personal jurisdiction consistent with the U.S. Constitution and KRS § 454.210(2) because Foster traveled to ResCare's corporate headquarters in Kentucky to attend meetings. *See* KRS § 454.210(2)(a)(1); *see, e.g. Power Investments, LLC v. SL EC, LLC*, 927 F.3d 914, 917-18 (6th Cir. 2019).

13.     A separate and independent basis for jurisdiction also exists under 28 U.S.C. § 1332(b) because all parties are of diverse citizenship, and the contracts and services in dispute exceed $75,000.

## FACTS COMMON TO ALL COUNTS

### I.     ResCare hires and promotes Timothy Foster as an executive-level business development manager

14.     For over a decade, Foster worked for ResCare as a senior/executive level employee overseeing various aspects of business, market, and customer development. Foster's career with ResCare began in 2007, when he was hired as Vice President of Program Development.

15.     In 2010, Foster was promoted to Vice President of Business Development. Later, he was promoted again to Senior Director of Sales/Development.

16.     In 2016, Foster began working in ResCare's workforce services line of business as Senior Director of Sales. Later that year, Foster became Vice President of Sales. Foster remained in the Vice President role until his resignation in February 2022.

17.     In his most recent role, Foster focused on growing/expanding the Company's workforce solutions business line and generating revenue sources. Foster identified target markets/customers, built new customer relationships, and retained existing relationships. Foster reported directly to the Vice President of workforce solutions, Bradley Williams.

18.     ResCare and/or its affiliated subsidiaries are licensed and do business in all 50 U.S. States, the Virgin Islands, Puerto Rico, and Ontario, Canada. With respect to Canada, ResCare is actively seeking business in all other Canadian provinces (and Foster was heavily involved in those efforts). It formerly had operations in Europe but closed those in approximately 2011.

19.     The geographic scope of Foster's position extended to the entire U.S. and Canada, sometimes especially in areas where ResCare did not have an established presence. His responsibilities extended to all states and geographical territories in which the Company had existing operations.

20.     In addition, Foster helped develop strategies for identifying target customers, identifying target markets, finding customers, and looking at new lines of business to generate revenue for the Company. Foster was also a lead person for the Company in attending and presenting at conferences to maintain ResCare's premier profile in the industry.

21.     As an example, at the time of his resignation, Foster was overseeing plans to expand the Company's operations in the Canadian market In the last year of his employment, Foster was

involved with over 20 proposals for new business with awards totaling around $100 Million Dollars in estimated revenue.

22.     In order to perform his job duties, Foster developed and relied upon vast amounts of proprietary and confidential data such as competitor research, market analytics, performance quadrants, strategic plans, bid processes, retention rates, profit margins, and a wealth of other information. In addition, Foster had detailed knowledge and access to, among other things, the Company's monthly and quarterly financial reviews, profit and loss margins, operational costs, expected return, start-up costs, contract pricing strategies, and budgets.

23.     As an example, the Company utilizes a sophisticated performance metrics system that uses predictive analytic tools to drive performance outcomes and identify opportunities to improve the service delivery process, which helps ResCare achieve consistent organizational performance across all operations. It also developed apps, plug-ins, and other proprietary methods and tools for tracking performance. Such information would be invaluable to competitors. Foster also had access to a proprietary business development system developed internally to manage the company's lead and prospecting processes, to determine probabilities of obtaining business and analyzing market data for past, present, and future business opportunities.

24.     All of the foregoing information is confidential. Many of these compilations of data and processes are considered trade secrets. Such information would be extremely valuable to a competitor. ResCare's employees have a duty to treat this information as confidential, and Foster knew his obligations in that regard.

## II.   ResCare takes reasonable and practical steps to protect its trade secrets and confidential information

25.     ResCare implements multiple security measures to secure the transmission of information throughout its network and protect data from unauthorized access, disclosure, or use.

26.     ResCare's business documents and related information are maintained on its internal network drives – a password is required to log into/access to the Company's network. Only authorized personnel are allowed to access the Company network. Many applications, including connecting remotely or accessing Outlook 365, require two-factor authentication.

27.     Specific divisions/departments within the Company store documents and information on their own drives/channels within ResCare's network and Microsoft Office 365 clous services. Company documents are saved on the sites and accessible only by those specifically granted access.

28.     Teams who regularly access confidential Company information, or documents which otherwise require additional protections, maintain their own secure SharePoint/Teams site that is password protected and can only be accessed by those granted authorization by ResCare's top leaders. These privileged accounts often require multi-factor authorization in addition to passwords.

29.     In addition, most ResCare office computers are locked, and external devices cannot be connected to them. Usually, only senior leaders have the capability of attaching an external device to a Company laptop. Even in this situation, ResCare's IT systems force encryption as to any external device connected to a Company computer to protect the confidentiality of Company information. Therefore, several steps must be taken by the user before any external device can be used.

30.     Foster worked for the Business Development Team in the Company's workforce solutions business line. The Business Development Team maintains a secure SharePoint/Teams site that can only be accessed by top leadership within that Team. Foster was one of seven people who had access to that particular SharePoint site.

31.     All data sent *via* ResCare's messaging systems are protected by antivirus and anti-spyware programs and is encrypted in transit. The ResCare network is monitored to protect against cyber-attacks and data is encrypted.

32.     Employees are prohibited from accessing any ResCare data, server, or account for any purpose other than conducting Company business, even if the employee has authorized access to same.

33.     ResCare's offices have restricted entry, and visitors must sign in, and be escorted or supervised by ResCare personnel.

34.     ResCare has comprehensive security policies and new employees are trained on these policies. Employees must attest on an annual basis that they have reviewed the Company's "Acceptable Use Policy" as part of the Company's annual compliance training. A copy of ResCare's Acceptable Use Policy is attached as Exhibit A to the Declaration of Stephen Myers ("Myers Decl."), filed contemporaneously herewith.

35.     ResCare's Acceptable Use Policy governs the use of ResCare's IT systems and computer resources and provides additional confidentiality protections and restrictions on the improper use of ResCare's computer systems. The policy is available to all employees on the Company's intranet.

36.     Section 4.3.1.1 of Res-Care's Acceptable Use Policy prohibits employees, on pain of disciplinary action, from "[f]orwarding company e-mails to non-authorized accounts, including an employee's own personal account[.]"

37.     In addition to the Acceptable Use Policy, ResCare has a standalone Confidentiality Policy prohibiting the use and disclosure of confidential information. A copy of the Confidentiality Policy is attached as Exhibit K to the Declaration of Bradley Williams filed contemporaneously

herewith.

38.    ResCare also has a Social Media Policy addressing the disclosure of the Company's trade secrets and proprietary/confidential information. A copy of the Social Media Policy is attached as Exhibit L to the Declaration of Bradley Williams filed contemporaneously herewith.

39.    ResCare also has a Conflict of Interest Policy that addresses the unauthorized use or dissemination of any confidential trade secret information, techniques, or business documents. A copy of the Conflict of Interest Policy is attached as Exhibit M to the Declaration of Bradley Williams filed contemporaneously herewith.

**III.    Foster's Employment Agreement**

40.    In addition to the measures described above, employees working in positions exposing them to confidential or proprietary information and/or trade secrets are asked to sign confidentiality agreements and other restrictive covenants in connection with their employment.

41.    At the time of his initial hire in 2007, Foster executed an Employment Agreement, which contained certain restrictive covenants governing confidentiality and competitive activities both during and after Foster's employment *See* Williams Decl., Exhibit A.

42.    In executing the Employment Agreement, Foster acknowledged that his position with the Company as Vice President placed him in a position of confidence and trust with the operations of the Company, its subsidiaries and affiliates; that Foster's position allowed him access to confidential information; and that certain restrictions were fair, reasonable and necessary to protect and preserve the benefits of Foster's employment. Agreement, ¶ 7(a).

43.    Specifically, the Employment Agreement contained confidentiality and non-disparagement covenants, under which Foster agreed to "not disclose or use or otherwise exploit for Employee's own benefit, or the benefit of any other Person . . . any Confidential Information .

. .” Williams Decl., Exhibit A, ¶ 7(b). The confidentiality provisions applied without limitation as to time – meaning that Foster was bound to protect the Company's confidential information even after his employment terminated for any reason.

44.    Paragraph 7(d)(iii) of the Employment Agreement defined "confidential information" as any business information relating to [the Company] or to the Business (whether or not constituting a trade secret) which has been or is treated by any of [ResCare or its affiliated companies] as proprietary and confidential and which is not generally known or ascertainable through proper means . . ."

45.    Paragraph 7(d)(iv) of the Employment Agreement defined the "Business of the Res-Care Companies" as "the business of providing training, educational, job placement and/or quality improvement services as provided in the [Company] Group, or providing management and/or consulting services to third parties relating to any of the foregoing."

46.    Among other things, "confidential information" was specifically defined to include customer lists and information relating to any client, supplier lists, pricing policies, consulting contracts, competitive bid information, records, operational methods, company policies and procedures, marketing data, plans, and strategies, business development plans, financial information, budgets, projections, earnings and any unpublished financial information." Williams Decl., Exhibit A, ¶ 7(d)(iii)(1)-(11).

47.    Paragraph 6 of the Employment Agreement further imposed duties on Foster to deliver and return all Company documents, information, and other property (including all confidential information) upon the termination of his employment.

48.    The Employment Agreement also contained a provision under which Foster agreed to not to "assist, participate in or be connected with, directly or indirectly, as an . . . employee,

agent, consultant, independent contractor or otherwise, any Person which is, at the time, directly or indirectly engaged in the Business of the [Company or its affiliate companies]" within the geographic territory applicable to Foster's employment. Foster further agreed that from the commencement date of the Employment Agreement until the date of termination, he would not "undertake any planning for or organization of any business activity that would be competitive with [the Company's business]. Williams Decl., Exhibit A, ¶ 7(c).

49.     Since Foster oversaw the development of customers and markets across the Company's entire workforce services operations, the non-compete covenant restricted competitive activities within the geographical region where the Company currently had business operations and/or where the Company was actively seeking to expand/begin new operations. Williams Decl., Exhibit A, ¶ 7(d)(ii). At the time he was hired, that included the 48 contiguous states of the United States, the U.S. Virgin Islands, Puerto Rico, Canada and the European Union, Switzerland and Norway (the "Territory"). *Id.*

50.     Foster acknowledged and agreed that the Territory was reasonably sized because ResCare was actively conducting business in those areas and/or aggressively pursuing expansion and new operations throughout the geographical area.

51.     Pursuant to Paragraph 7(c) of the Employment Agreement, the non-compete provisions above remained in effect for the duration of Foster's employment and for a one year term following the date of Foster's termination.

52.     Foster agreed and acknowledged that the nature and time periods of the restrictive covenants described above were reasonable and that the Company would sustain irreparable harm if Foster were to breach such covenants. Foster further agreed and acknowledged that, in the event of a breach, the Company would be entitled to equitable relief, including preliminary and

permanent injunctive relief to prevent and/or halt a breach or threatened breach of the covenants. *See* Williams Decl., Exhibit A, ¶¶ (7)(a), (e).

IV.     **Foster accepts a position with Grant Associates and resigns his employment**

53.     As alleged above, Grant Associates is in the workforce solutions and provides services of the same type as ResCare. The two companies are direct competitors.

54.     Grant Associates offered Foster employment in the position of Vice President of Public and Private Partnerships. ResCare does not know exactly when Grant Associates formally extended Foster the offer or when Foster accepted the offer; upon information and belief, it was some time in late 2021.

55.     On January 24, 2022, Foster notified Williams verbally of his intent to resign. On January 30, 2022, Foster submitted his resignation notice in writing via email to Williams and ResCare's President of workforce solutions, Mark Douglass. via email. A copy of Foster's resignation notice and accompanying email is attached as Exhibit B to the Declaration of Bradley Williams filed contemporaneously herewith. Foster stated that his last day with ResCare would be February 11, 2022.

56.     Foster indicated his intent to begin working for Grant Associates, a direct competitor, and acknowledged that he was subject to non-compete covenants that prohibited him from doing so. Despite this, Foster asked ResCare to "relieve[]" him of those contractual obligation so he could pursue employment with Grant Associates. Foster's request is evidence that he knew the nature of his anticipated position at Grant Associates plainly violated his restrictive covenants with ResCare.

57.     ResCare understandably could not agree to Foster's request – Foster was seeking to work in a position nearly identical to that which he held for nearly five years at ResCare. Grant

Associates competed with ResCare for the same customers and in the same markets.

58.     Upon further information and belief, the position Foster accepted with Grant Associates is substantially similar to his former position at ResCare and, at a minimum, involves many of the same responsibilities with regard to customer and market development.

59.     Notwithstanding his request to be excused from his non-compete covenants, Foster otherwise reiterated his agreement to abide by his non-disparagement and confidentiality obligations.

60.     When ResCare learned that Grant Associates had recruited and planned to hire Foster, its in-house counsel notified counsel for Grant Associates' parent company of the impending contractual violations and Foster's conduct.  Despite that communication, Grant has continued to employ Foster.

61.     Grant Associates thus knowingly interfered with ResCare's contractual relationship with Foster.

62.     Foster's first day of employment with Grant Associates was February 14, 2022.

**V.      ResCare discovers that Foster misappropriated its confidential information and trade secrets in anticipation of his employment with Grant Associates**

63.     Foster's willingness to breach his Employment Agreement by accepting a position with Grant Associates prompted ResCare to further investigate Foster's conduct. After Foster returned his Company-issued laptop, ResCare submitted it for forensic review and analysis. The review/analysis is ongoing.

64.     ResCare also conducted a preliminary review of Foster's email activity during the last few weeks of his employment. It discovered that Foster emailed ResCare's confidential and proprietary documents/information to his personal Gmail account.

65.     The documents Foster emailed himself demonstrate that he was specifically taking

key information in preparation of joining a competitive business.

66.     For example, on December 7, 2021, Foster emailed himself a document called "New Line of Business, Product, or Service assessment". A true and correct copy of that document is attached as Exhibit C to the Declaration of Bradley Williams filed contemporaneously herewith. Upon information and belief, Foster already accepted, or planned to accept, Grant Associates' offer of employment at the time he emailed the document to himself.

67.     The document itself was developed by ResCare's internal business development team in anticipation of the Company's 2022 strategic planning meeting. It was saved in a subfolder on the Business Development Team's private internal site. Documents saved to the site are not generally accessible to employees – only seven employees (including Foster, members of the Business Development Team, and executive-level managers) had access to the documents stored in that location/site.

68.     Foster's decision to email himself the document was particularly suspicious since the document had not yet been discussed or shared with Foster. Moreover, the document was drafted in anticipation of a strategic planning meeting scheduled to take place after Foster notified ResCare of his resignation and was told not to attend the meeting. In other words, Foster had no legitimate reason to access the document (let alone email himself a copy of it) since he likely had no plans to attend the meeting, knowing he intended to resign.

69.     The business assessment document described above summarized the Company's key strategies for assessing new lines of business, products, and services. The document reflects a compilation of considerations which, taken together, reflect ResCare's unique approach to evaluating whether a particular opportunity should be pursued.

70.     The document is not publicly available (nor was it even available to employees

generally); the Company protected the secrecy of the document by limiting access to seven individuals involved in business development and strategic planning; ResCare uses the document in competing for new customers/markets; the document is valuable and a competitor could use the document to unfairly compete with ResCare by gaining insight into the manner ResCare considers new lines of business, products and/or services for purposes of strategic planning.

71.    Foster emailed himself the above-described document in violation of the Company's Acceptable Use Policy and other policies, including its Conflict of Interest Policy, Social Media Policy, and Confidentiality Policy. Foster did not have authorization to email the document to his personal Gmail account. The only reasonable explanation for doing so is that Foster intended to use the document in furtherance of his new position with Grant Associates.

72.    On December 8, 2021, Foster emailed himself a PowerPoint file containing a sales presentation. A copy of that presentation is attached as Exhibit D to the Declaration of Bradley Williams filed contemporaneously herewith. The presentation is highly confidential, watermarked as such, and is not to be distributed to anyone outside of the Company. The presentation contains detailed information regarding the Company's business operations, proprietary tools and technologies, performance analytics, revenues, profits, and a plethora of other sensitive and highly confidential information regarding ResCare's workforce solutions business line.

73.    Foster had no legitimate reason to email a copy of the above-described presentation to his personal email account, and he did so without ResCare's knowledge or authorization. Foster emailed himself a copy of this same PowerPoint presentation again on January 27, 2022 (the day before the date of his resignation notice). A copy of Foster's January 27th email to himself is attached as Exhibit E to the Declaration of Bradley Williams filed contemporaneously herewith.

74.    On December 9, 2021, Foster emailed to his personal Gmail account another

PowerPoint file containing the Company's guide for new and enhanced strategies around diversity, equity, inclusion, and belonging for use in business development and growth proposals and activity. The presentation reflects the Company's strategy for describing such plans to customers. A copy of that presentation is attached as Exhibit F to the Declaration of Bradley Williams filed contemporaneously herewith.

75.     The presentation is stored on the Business Development Team's shared site, and is only accessible by authorized individuals (which, at the time, included Foster). The document contains valuable proprietary information that is kept confidential. Foster emailed himself the presentation without authorization and for no legitimate reason. He did so in anticipation of using the presentation in his future employment with Grant Associates and in violation of his Employment Agreement and multiple Company Policies prohibiting the unauthorized use and disclosure of confidential information.

76.     On January 25, 2022, Foster emailed himself another PowerPoint presentation titled "Equus Competitor Landscape". The presentation is watermarked that it contains proprietary content and is not to be replicated, duplicated, referenced, or quoted without permission. A copy of the document is attached as Exhibit G to the Declaration of Bradley Williams filed contemporaneously herewith.

77.     The Competitor Landscape presentation was saved on the Company's secured internal site accessible only by members of senior leadership of the organization. Foster initially used this document as a template to create a different presentation for the group's 2022 strategic planning session (which he did not attend and knew he would not be attending as of January 25, 2022), and the first two slides of the presentation reflect that.

78.     The bulk of the presentation is one that ResCare uses internally to train

management, and it contains detailed insight into how ResCare's workforce services business operates and performs internally. It is only shared among ResCare's top-level leadership team. The presentation contains the Company's proprietary processes, performance measures, and other unique tools for analyzing metrics – it is confidential, contains proprietary information, and would be highly valuable to a business wanting to gain unfair competitive advantage in the workforce services industry.

79.     Foster had no legitimate reason to email a copy of the Competitor Landscape presentation to his personal email account. He did so without the Company's authorization and in violation of the Company's Acceptable Use Policy and other policies. The fact that Foster emailed himself the document after verbally announcing his resignation indicates that Foster intended to use the document in furtherance of his employment with Grant Associates.

80.     The same day (January 25th), Foster also emailed to his personal Gmail account a PowerPoint presentation regarding customer service as part of the Company's "Talent Enrichment Program". A copy of the presentation is attached as Exhibit H to the Declaration of Bradley Williams filed contemporaneously herewith. While the presentation dates back to 2014, it is still relevant, and components of the strategies continue to be used within the Company today. It outlines ResCare's funder-relations philosophy and updated versions of this document are used to train new leaders across the organization.

81.     The Talent Enrichment Program presentation is stored on the Company's shared Teams site, which is only accessible to top leaders and members of the Business Development Team (which, at the time, included Foster). The presentation is not shared outside of the organization and is unique to ResCare. The presentation would give a competitor valuable insight into ResCare's funder-relations philosophies. Foster emailed the document to himself without

authorization and in violation of the Company's Acceptable Use Policy and other policies.

82.    Foster continued to send confidential and proprietary documents to himself after notifying ResCare of his plans to resign and accept employment with a competitor. Doing so is direct evidence of Foster's intent to misappropriate and use ResCare's confidential information to benefit his new employer.

83.    For example, on January 31, 2022, Foster sent a PowerPoint presentation titled "US Conference Strategy 2022" to his personal Gmail account. A copy of the presentation is attached as Exhibit I to the Declaration of Bradley Williams filed contemporaneously herewith. The presentation contains detailed information regarding every industry conference and marketing opportunity for ResCare's workforce solutions business line; it sets forth the Company's plan to generating leads for new business by attending major industry events; it contains detailed funding, budgetary, and other financial information for those conferences.

84.    The information contained in the Conference Strategy presentation is a compilation of months of research and contains highly confidential and proprietary information. If a competitor had access to such information, they would essentially know ResCare's business development plans (related to conference attendance) for the entire year of 2022. The value and importance of this presentation is evidenced in the fact that Foster emailed it to himself not once, but twice – first on January 31, 2022, then again on February 10, 2022 – his last full day of employment with ResCare. A copy of Foster's February 10th email attaching the presentation is attached as Exhibit J to the Declaration of Bradley Williams filed contemporaneously herewith.

85.    Clearly Foster knew, at the time he emailed himself the presentation, that he would not be attending any more conferences on behalf of ResCare in 2022. The only reason Foster would email himself the presentation was to use it in furtherance of his employment with Grant

- 17 -

Associates to unfairly compete with ResCare.

86.     Foster emailed himself all of the above-described documents in violation of the Company's Acceptable Use Policy, Confidentiality Policy, Social Media Policy, and Conflict of Interest Policy, and in violation of the confidentiality provisions in his Employment Agreement.

87.     In addition, Foster was contractually obligated under the Employment Agreement to return (and not retain) any and all of ResCare's Company documents immediately upon termination of his employment.

88.     Foster has not returned any of the above documents to ResCare. He has unlawfully retained these documents in violation of his Employment Agreement and ResCare's policies.

89.     The nature of documents Foster misappropriated are exactly the type a departing employee would take in order to unfairly compete with his former employer.

90.     Foster took ResCare's proprietary and confidential information to unlawfully compete on behalf of his new employer, Grant Associates.

91.     Foster's resignation notice is further evidence of his intent – in the notice, Foster acknowledges his confidentiality obligations and (falsely) claims he will adhere to these obligations. Yet, Foster blatantly violated his obligations days after submitting his notice by surreptitiously sending valuable documents to his personal email (and not returning these documents to ResCare).

92.     ResCare has not yet completed its forensic review of Foster's email and other computer activity, but believe it is likely Foster misappropriated other ResCare documents.

93.     ResCare further believes forensic discovery will reveal that Foster has accessed, referenced, and/or used these documents in connection with his subsequent employment with Grant Associates.

94.     ResCare is deeply unsettled by Foster's conduct, and his continued breach of these contractual obligations are causing the Company irreparable harm.

95.     After learning of Foster's misappropriation of the documents described above, ResCare specifically notified Grant Associates of Foster's conduct.  A copy of that notification is attached as Exhibit A to the Declaration of Jeff Chapuran filed contemporaneously herewith.

96.     Despite knowing Foster possessed ResCare's valuable confidential and proprietary information and trade secrets (in violation of federal and state law, as well as his Employment Agreement), Grant Associates followed through with Foster's hiring and employment.

97.     On information and belief, Foster has already used, referenced, relied upon, and/or disseminated ResCare's confidential information and trade secrets since beginning work with Grant Associates. Grant Associates has taken no action to return ResCare's information or documents, or otherwise protect the confidentiality of same.

98.     By knowingly allowing Foster's misappropriation of ResCare's confidential information and trade secrets, DB Grant is similarly in violation of federal and state trade secrets laws.

99.     The above violations have caused and continue to cause ResCare irreparable harm, to which ResCare has no adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### Breach of Confidentiality Obligations under the Employment Agreement
### (against Foster)

55.     ResCare realleges and incorporates the foregoing allegations as if fully set forth herein.

56.     Foster entered into the Employment Agreement upon commencing employment

with ResCare. The Employment Agreement is a valid and enforceable contract supported by adequate consideration (*i.e.* Foster's employment and continued employment). In further consideration of the covenants contained in the Employment Agreement, Foster received specialized knowledge, training, and expertise he would not have otherwise acquired during his employment with ResCare. *See Charles T. Creech Inc. v. Brown*, 433 S.W.3d 345, 354 (Ky. 2014)

57.     The Employment Agreement contains confidentiality provisions which prohibit the unauthorized use, disclosure, dissemination, and/or retention of ResCare's confidential and proprietary information and trade secrets. Foster agreed that such provisions were reasonable and necessary given his position as an executive-level employee who regularly used such information in the course of his ResCare employment.

58.     Specifically, the Employment Agreement contained confidentiality and non-disparagement covenants, under which Foster agreed to "not disclose or use or otherwise exploit for Employee's own benefit, or the benefit of any other Person . . . any Confidential Information . . ." Williams Decl., Exhibit A, ¶ 7(b). The confidentiality provisions applied without limitation as to time – meaning that Foster was bound to protect the Company's confidential information even after his employment terminated for any reason.

59.     The Employment Agreement defines "confidential information" as any business information relating to [the Company] or to the Business (whether or not constituting a trade secret) which has been or is treated by any of [ResCare or its affiliated companies] as proprietary and confidential and which is not generally known or ascertainable through proper means . . ." Williams Decl., Exhibit A, ¶ 7(d)(iii).

60.     The Employment Agreement also imposed duties on Foster to deliver and return all Company documents, information, and other property (including all confidential information)

upon the termination of his employment. Williams Decl., Exhibit A, ¶ 6.

61.     As alleged in Paragraphs 66 through 84 above, Foster emailed multiple Company documents to his personal email account prior to resigning his employment with ResCare and, at the time he did so, Foster already planned to begin working for a competitor.

62.     The documents described above contain ResCare's confidential and proprietary information and/or amount to trade secrets. Foster has not returned these documents to ResCare and has violated his contractual obligations by doing so.

63.     ResCare has been harmed by Foster's breach of his contractual obligations and will continue to suffer irreparable harm if Foster is continued to breach the Employment Agreement. Proof of actual damages is not required to establish harm.

64.     The Employment Agreement provides for injunctive relief in the event of a breach and the parties agreed that such relief is proper under the circumstances as it is the only way to prevent the harm caused by Foster's continued breach of the Employment Agreement.

65.     ResCare seeks damages in the form of monetary relief for actual harm caused by Foster's breach of the Employment Agreement, injunctive relief, attorney's fees, interest, and costs of litigation.

**COUNT II**
**Breach of the restrictive covenants under the Employment Agreement**
**(against Foster)**

66.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

67.     Plaintiff entered into the Employment Agreement upon commencing his employment with ResCare. The Employment Agreement is a valid and enforceable contract.

68.     The Employment Agreement and restrictive covenants contained therein are

supported by adequate consideration, are reasonable in scope and duration, and are not more extensive than is reasonable and necessary for ResCare to protect its legitimate business interests and goodwill.

69.     The Employment Agreement contained a non-compete covenant, under which Foster agreed to not to "assist, participate in or be connected with, directly or indirectly, as an . . . employee, agent, consultant, independent contractor or otherwise, any Person which is, at the time, directly or indirectly engaged in the Business of the [Company or its affiliate companies]" within the geographic territory applicable to Foster's employment. Foster further agreed that from the commencement date of the Employment Agreement until the date of termination, he would not "undertake any planning for or organization of any business activity that would be competitive with [the Company's business]. Williams Decl., Exhibit A, ¶ 7(c).

70.     The Employment Agreement expressly states that the restrictive covenants will survive through the expiration of the term of the Employment Agreement and continue to remain in effect until one year after Foster's last day of employment. Williams Decl., Exhibit A, ¶ 7(c).

71.     Foster's last day of employment with ResCare was February 11, 2022. Thus, he is still bound by the non-compete covenants contained in the Employment Agreement.

72.     Grant Associates is a direct competitor of ResCare in the workforce solutions industry.

73.     Grant Associates offered Foster employment in the position of Vice President of Public and Private Partnerships, a position similar to that Foster held with ResCare, and a position that involves engaging in activities competitive to ResCare. Thus, Foster's employment with Grant Associates in this position violates his non-compete obligations to ResCare under the Employment Agreement.

74.     ResCare has been harmed by Foster's breach of the non-compete covenant in the Employment Agreement and stands to suffer irreparable harm if Foster is allowed to continue engaging in competitive activities in breach of the Employment Agreement. Proof of actual damages is not required to establish harm.

75.     The Employment Agreement provides for injunctive relief in the event of a breach. Such relief is proper under the circumstances as it is the only way to prevent the harm caused by Foster's continued employment with Grant Associates.

76.     ResCare seeks damages in the form of monetary relief for actual harm caused by Foster's breach of the Employment Agreement, injunctive relief, attorney's fees, interest, and costs of litigation.

## COUNT III
## Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836
## (against Foster and Grant Associates)

77.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

78.     The information and documents described in Paragraphs 66 through 84 above constitute trade secrets under the DTSA because they derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use, and because ResCare took reasonable and practical measures to maintain the secrecy and confidentiality of its trade secrets and confidential information.

79.     ResCare has invested substantial time and resources in developing its trade secrets to lawfully compete in the workforce services industry. Should its trade secrets become public or available to a competitor, they will lose their value to ResCare. Because of the value of these trade

secrets, ResCare has made and continues to make efforts to protect their secrecy, including directing employees like Foster to maintain the confidentiality of same.

80.     Foster acquired ResCare's trade secrets in connection with his employment and did so under a duty to maintain their confidentiality.

81.     After Foster accepted employment with a competitor (Grant Associates), he emailed ResCare's trade secrets to his personal email account in anticipation of departing ResCare and beginning work for a competitor, Grant Associates. Foster thus acquired those trade secrets by improper means.

82.     ResCare notified Grant Associates of Foster's misappropriation described above. It did so prior to Foster's first day of employment with Grant Associates.

83.     Despite knowing that Foster improperly acquired and possessed ResCare's trade secrets, Grant Associates proceeded with hiring Foster and allowed him to work in the capacity of Vice President – a senior leadership position.

84.     Grant Associates knew Foster intended to take ResCare's trade secrets and use them in connection with his employment with Grant Associates. Grant Associates has taken no steps to confiscate the trade secrets in Foster's possession and/or prevent Foster from using those trade secrets in furtherance of his employment with Grant Associates.

85.     Upon information and belief, Foster has used, referenced, and/or disseminated ResCare's trade secrets in the course of his employment with Grant Associates

86.     Further, even if Foster has not yet used or disclosed ResCare's trade secrets, the competitive nature of Foster's current employment with Grant Associates will demand that he disclose ResCare's trade secrets, regardless of Foster's intent to disclose or make use of the trade secrets.

87.     Grant Associates is vicariously liable for Foster's misappropriation under the theory of *respondeat superior* liability because it had knowledge of and ratified Foster's conduct.

88.     As a proximate result of Defendants' misappropriation of ResCare's trade secrets, ResCare has suffered, and will continue to suffer, irreparable harm and is entitled to the remedies provided by 18 U.S.C. § 1836(b)(3), including immediate injunctive relief and damages.

89.     Defendants' acts have irreparably harmed ResCare and will continue to irreparably harm ResCare unless enjoined by the Court, as a result of which ResCare is without adequate remedy at law.

90.     ResCare is thus entitled to an injunction preventing the actual and threatened continuing misappropriation of ResCare's trade secrets; an order requiring all Defendants to take immediate steps to protect and preserve ResCare's trade secrets; a judgment for damages equal to ResCare's actual loss caused by Foster's misappropriations; a judgment for damages in the amount Defendants have been unjustly enriched by Foster's misappropriation; a judgment requiring Defendants to pay ResCare exemplary damages equal to two (2) times any underlying damages award; and/or a judgment requiring Defendants to pay ResCare for its attorney's fees and costs.

## COUNT IV
### Violation of the Kentucky Uniform Trade Secrets Act, KRS 365.880, *et seq.*
### (against Foster and Grant Associates)

55.     Plaintiff realleges and incorporates the foregoing allegations as if fully set forth herein.

56.     The information and documents described in Paragraphs 66 through 84 above constitute trade secrets under the Kentucky Uniform Trade Secrets Act ("KUTSA") because they are not generally known to other persons. Competitors can derive economic value from their disclosure or use and such information would be and is extremely valuable to ResCare's

- 25 -

competitors and would enable them to unfairly compete against ResCare.

57.     ResCare has undertaken reasonable efforts to maintain the secrecy of its confidential information including, among other things, having employees like Foster execute Employment Agreements and restrictive covenants.

58.     Foster acquired ResCare's trade secrets in connection with his employment and did so under a duty to maintain their confidentiality.

59.     After Foster accepted employment with a competitor (Grant Associates), he emailed ResCare's trade secrets to his personal email account in anticipation of departing ResCare and beginning work for a competitor, Grant Associates. Foster thus acquired those trade secrets by improper means.

60.     ResCare notified Grant Associates of Foster's misappropriation described above. It did so prior to Foster's first day of employment with Grant Associates.

61.     Despite knowing that Foster improperly acquired and possessed ResCare's trade secrets, Grant Associates proceeded with hiring Foster and allowed him to work in the capacity of Vice President – a senior leadership position.

62.     Grant Associates knew Foster intended to take ResCare's trade secrets and use them in connection with his employment with Grant Associates. Grant Associates has taken no steps to confiscate the trade secrets in Foster's possession and/or prevent Foster from using those trade secrets in furtherance of his employment with Grant Associates.

63.     Upon information and belief, Foster has used, referenced, and/or disseminated ResCare's trade secrets in the course of his employment with Grant Associates

64.     Further, even if Foster has not yet used or disclosed ResCare's trade secrets, the competitive nature of Foster's current employment with Grant Associates will demand that he

disclose ResCare's trade secrets, regardless of Foster's intent to disclose or make use of the trade secrets.

65.     Grant Associates is vicariously liable for Foster's misappropriation under the theory of *respondeat superior* liability because it had knowledge of and ratified Foster's conduct.

66.     As a direct and proximate result of Defendants' misappropriation, ResCare has suffered and continues to suffer irreparable harm by virtue of the unauthorized and unlawful use of its trade secrets.

67.     ResCare has no adequate remedy at law or otherwise to address its irreparable injury, and thus injunctive relief under KRS 365.882 will serve the public interest.

68.     In addition to injunctive relief, ResCare seeks monetary damages for the actual loss caused by Defendants' misappropriation and the unjust enrichment that is not taken into account in computing actual loss, attorneys' fees, interest, and costs of litigation.

## COUNT V
### Tortious Interference with Business and Contractual Relationships
### (against Grant Associates)

69.     Plaintiff realleges and incorporates the foregoing paragraphs as if sully set forth herein.

70.     ResCare maintained a business and contractual relationship with Foster under the Employment Agreement, under which Foster agreed to return and to not use or disseminate ResCare's Company documents upon termination of his employment. Foster was also contractually obligated to abide by the terms of the non-compete covenant in his Employment Agreement, for which he received valuable and adequate consideration.

71.     Grant Associates knew of Foster's contractual obligations to ResCare. It was specifically informed (prior to Foster's first day of employment with Grant Associates) that Foster

had breached his contractual obligations to maintain the confidentiality of ResCare's Company documents. Further, Grant Associates was specifically notified that hiring Foster as its Vice President of Public and Private Partnerships would directly violate the terms of Foster's non-compete covenant with ResCare.

72.     Despite knowing the contractual violations that would result, Grant Associates proceeded with hiring Foster and allowing Foster to commence and continue his employment with Grant Associates. Thus, Grant Associates knowingly and tortiously interfered with Foster's contractual relationship with ResCare under the Employment Agreement.

73.     Grant Associates tortious conduct has damaged, injured, and irreparably harmed ResCare.

74.     In addition to the injunctive relief sought above, ResCare seeks monetary damages for the actual loss caused by Grant Associates' conduct and the unjust enrichment that is not taken into account in computing actual loss, attorneys' fees, interest, and costs of litigation.

## PRAYER FOR RELIEF

WHEREFORE, ResCare requests the following relief:

(a)     That Defendants be enjoined, preliminarily and thereafter permanently, from retaining, using or disclosing any of ResCare's trade secrets, confidential information, or property;

(b)     That Defendants be ordered to identify all people or entities with whom any of ResCare's information has been shared (or on whose computer systems such information has been stored), in whole or in part, whether in writing, electronically, or orally;

(c)     That the Court order a thorough forensic review of Foster's electronic devices and email accounts used in connection with his Grant Associates employment, and a thorough forensic review of Grant Associates' computer and network systems by a third-party forensic search firm

approved by ResCare to identify, segregate, and return ResCare's property, documents, and information;

(d)     That ResCare be permitted to engage in expedited discovery designed to identify and segregate its documents and/or information contained within Grant Associates' network systems and on its company-issued devices;

(e)     That Defendants be enjoined from using any document or information containing or derived from ResCare's trade secrets, confidential information, and property;

(f)     That Foster be preliminarily, then permanently, enjoined from working for Grant Associates and/or any other Grant Associates affiliate. Because of the scope and importance of the trade secrets Foster misappropriated from ResCare, and because he has gone to work for a direct competitor, this is one of the appropriate situations where the Court should enjoin Foster from engaging in competitive activities (including working for Grant Associates) to prevent his engaging in further improper conduct;

(h)     That Defendants pay damages to ResCare for any actual losses, damages, or unjust enrichment caused by Defendants' misappropriation of ResCare's trade secrets and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or, in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for Defendants' unauthorized disclosure or use of ResCare's trade secrets.

(i)     That Defendants be ordered to pay exemplary damages, attorneys' fees, and litigation costs, based upon their violation of federal law and state common law for their bad faith in allowing the unlawful taking and use of ResCare's property and trade secrets;

(j)     That Defendants be ordered to pay the costs of these proceedings;

(k)     That Plaintiff be granted a trial by jury on all issues so triable; and

(l)     The Court order such other and further relief as it deems appropriate.

Respectfully submitted this 14th day of March, 2022.

HAWKINS PARNELL & YOUNG LLP

*/s/ Robert L. McKinney, II*
Robert L. McKinney, II
KY State Bar No.  90067
rmckinney@hpylaw.com
The Renaissance Tower
707 Virginia St E, Suite 1601
Charleston, WV 25301
Telephone:     (304) 345-8545
Facsimile:     (304) 345-8544

*Attorneys for Plaintiff ResCare Inc.*
